UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Davis Frame Co., Inc.,
     Plaintiff

     v.                               Civil No. 05-cv-160-SM
                                            Opinion No. 2006 DNH 021
Patrice Reilly
and James Reilly,
     Defendants

**O R D E R**

Davis Frame Co., Inc. ("Davis Frame"), a designer, manufacturer, and seller of timber frame home packages, has sued its former customers, Patrice and James Reilly ("the Reillys"), in five counts. Defendants assert three counterclaims: (1) violation of the Sherman Act, 15 U.S.C. § 1 (Count I); (2) violation of the New Hampshire Consumer Protection Act ("CPA"), N.H. Rev. Stat. Ann. ("RSA") § 358-A; and (3) fraudulent misrepresentation. Before the court is plaintiff's motion to dismiss all three counterclaims. For the reasons given, plaintiff's motion to dismiss is granted.

**The Legal Standard**

A motion to dismiss for "failure to state a claim upon which relief can be granted," FED. R. CIV. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  When considering a motion to dismiss under Rule 12(b)(6), the court must "accept as true the factual allegations of the complaint and construe all reasonable inferences therefrom in favor of [plaintiff]." Perry v. N.E. Bus. Serv., Inc., 347 F.3d 343, 344 (1st Cir. 2003) (citing Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998)).  "A district court may grant a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted only if 'it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.'" Pomerleau v. W. Springfield Pub. Sch., 362 F.3d 143, 145 (1st Cir. 2004) (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

2

**Background**

The facts are drawn from plaintiff's complaint and defendants' counterclaim, and are construed most favorably to defendants. At some point in early September 2003, the Reillys, who had some incomplete architectural plans, spoke with Dana Roberts, then a Davis Frame employee, about the possibility of having Davis Frame use those incomplete plans to prepare a useful set of plans and drawings for a timber frame home. (Countercl. ¶ 13.) Reilly thought he might cut the timber for the home himself. Roberts did not object, "and it was understood that the Reillys could take the plan to be developed by [Davis Frame] to any company they wanted to cut the timber." (Id.)

On September 15, 2003, the parties executed a "Design Deposit Agreement" covering the production of "preliminary plans and drawings."[1] (Compl., Ex. 1.) The first paragraph of that agreement provides:

---

[1] Specifically, Davis Frame promised to "furnish Purchaser with sets of preliminary plans including the following: all floor plans, four [4] elevations, a building cross section, and a preliminary timber frame plan." (Compl., Ex.1.)

3

> The undersigned PURCHASER, wishing to obtain preliminary plans and drawings of a custom designed timber frame package from the Davis Frame Company, Inc., <u>in order to determine whether Purchaser wishes to purchase said package</u>, and Davis Frame Company, Inc. desiring to provide such plans, hereby agree as follows:

(<u>Id.</u> (emphasis added).)  Under the agreement, Davis Frame promised to furnish the Reillys with a set of preliminary plans, and the Reillys promised to pay Davis Frame a deposit, from which Davis Frame would be paid for its design work at a rate of $60 per hour, plus various expenses.  (<u>Id.</u>)  In addition, in the event the Reillys decided to purchase a Davis Frame package, the agreement called for some or all of their deposit to be credited toward the purchase price of the frame package.  (<u>Id.</u>)  Finally, the agreement provides:

> 7.  Purchaser represents that the plan specifications or drawings of any kind (hereinafter "plans") provided by the Purchaser to Davis Frame Company, Inc. are the exclusive property of the Purchaser, and the Purchaser shall have the full right and authority to utilize the plans without violation of any law prohibiting such use.
>
> . . .
>
> 9.  Once the plans are produced and designed for the Purchaser by Davis Frame Company, Inc., Purchaser assigns all of their rights in and to said plans to Davis Frame Company, Inc.  Davis Frame Company, Inc.

> shall own the exclusive copyright to the plans subject
> to its use in Purchaser's construction of its Davis
> Frame Company, Inc. timber frame package.

(Id.)

After the parties executed the Design Deposit Agreement, the Reillys paid Davis Frame a deposit of $5,250.[2]  (Countercl. ¶ 15.)  Davis Frame, in turn, produced a set of plans which it sent to the Reillys on October 31, 2003.  (Compl. ¶ 12.)  Among other identifying information, the plans contained Davis Frame's copyright notice.  (Compl. ¶ 13.)

Subsequently, the Reillys informed Davis Frame that they did not want to purchase a Davis Frame package.  (Countercl. ¶ 17.) In response, Davis Frame "informed the Reillys that [it] would pursue 'all avenues available' unless [] the Reillys purchased a timber frame package from [Davis Frame] or, in the alternative, paid [Davis Frame] an additional $10,000."  (Id.)  In its complaint, Davis Frame quotes its communication with the Reillys at greater length: "[I]f you cho[o]se to cut the frame yourself

---

[2] Ultimately, $609.80 of that deposit was returned to the Reillys, under the terms of the agreement.  (Countercl. ¶ 15.)

or if you cho[o]se to have another timber frame company cut this
frame, without purchasing the copyrights, we will seek all
avenues available to us."  (Compl. ¶ 15.)

On May 4, 2004, the Reillys filed an altered copy of the
plans produced for them by Davis Frame with the Roxbury,
Connecticut, Building Department, an altered copy of the plans
produced for them by Davis Frame.  The principal alterations to
those plans included: (1) deletion of Davis Frame's copyright
notice and logo; (2) addition of an engineer's seal; and (3)
renumbering of the pages.  The substantive content of the two
sets of plans is identical.  The Town of Roxbury approved the
plans, and the Reillys have commenced construction based on them.

Davis Frame sued the Reillys for copyright infringement,
breach of contract, trademark infringement, unfair competition,
and violation of the New Hampshire Consumer Protection Act.  The
Reillys have asserted counterclaims for violation of the Sherman
Act (Count I) and the New Hampshire Consumer Protection Act
(Count III), as well as fraudulent misrepresentation (Count II).

**Discussion**

A. Sherman Act (Count I)

In Count I of their counterclaim, the Reillys assert that Davis Frame's license to use its copyrighted architectural plans, conditioned on the purchase of a timber frame package, constitutes a "tying" arrangement in violation of section 1 of the Sherman Act, 15 U.S.C. § 1.  In objecting to Davis Frame's motion to dismiss, the Reillys state their claim this way: "The contract in issue, as alleged even by [Davis Frame], ties the use of the architectural plans to the purchase of [Davis Frame's] custom timber frame package."  (Def.'s Obj. at 2.)  Davis Frame seeks dismissal on grounds that the facts alleged by the Reillys satisfy none of the four elements of a Sherman Act tying claim, and that even an adequately pled tying claim would be trumped by the Copyright Act.

Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

7

15 U.S.C. § 1.  "Section 1 of the Sherman Act prohibits a seller

from 'tying' the sale of one product to the purchase of a second

product if the seller thereby avoids competition on the merits of

the 'tied' product."  Borschow Hosp. & Med. Supplies, Inc. v.

Cesar Castillo Inc., 96 F.3d 10, 17 (1st Cir. 1996) (citing 15

U.S.C. § 1; Data Gen. Corp. v. Grumman Sys. Support Corp., 36

F.3d 1147, 1178 (1st Cir. 1994)).


The United States Supreme Court has defined tying in the

following way:

> A tying arrangement is "an agreement by a party to
> sell one product but only on the condition that the
> buyer also purchases a different (or tied) product, or
> at least agrees that he will not purchase that product
> from any other supplier."  Northern Pacific R. Co. v.
> United States, 356 U.S. 1, 5–6 (1958).  Such an
> arrangement violates § 1 of the Sherman Act if the
> seller has "appreciable economic power" in the tying
> product market and if the arrangement affects a
> substantial volume of commerce in the tied market.
> Fortner Enterprises, Inc. v. United States Steel Corp.,
> 394 U.S. 495, 503 (1969).

Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 461–

62 (1992) (parallel citations omitted).


There are essentially four elements to a per se tying

claim: (1) the tying and the tied products are actually

8

two distinct products; (2) there is an agreement or
condition, express or implied, that establishes a tie;
(3) the entity accused of tying has sufficient economic
power in the market for the tying product to distort
consumers' choices with respect to the tied product;
and (4) the tie forecloses a substantial amount of
commerce in the market for the tied product.

Borschow, 96 F.3d at 17 (quoting Data General, 36 F.3d at 1178–
79).

Here, Davis Frame, the counterclaim defendant, argues that
the Reillys have failed to allege facts sufficient to establish
any of the four elements of a tying claim.  The Reillys, of
course, disagree.

This case presents an unusual factual basis for a Sherman
Act tying claim.  In Eastman Kodak, for example, "Kodak
implemented a policy of selling replacement parts for
micrographic and copying machines only to buyers of Kodak
equipment who use Kodak service or repair their own machines."
504 U.S. at 458.  That is, Kodak tied the sale of a product
customers wanted (Kodak parts) to the purchase of a product they
did not necessarily want (Kodak service).  In United States v.
Loew's Inc., Loew's, while selling television stations the right

to broadcast motion pictures, "conditioned the license or sale of one or more feature films upon the acceptance by the station of a package or block containing one or more unwanted or inferior films."  371 U.S. 38, 40 (1962).  In other words, Loew's tied the sale of a product consumers wanted (good movies) to the purchase of a product they did not necessarily want (bad movies).

Here, in contrast with <u>Eastman Kodak</u> and <u>Loew's</u>, there are not two things that may be purchased, but three: design services, copyright in the finished design, and timber frame packages.  The Reillys claim that Davis Frame illegally tied copyright in its plans to timber frame packages.  But, on the facts alleged by the Reillys, and construing all reasonable inferences in their favor, Davis Frame did not tell the Reillys that they could not purchase the right to use the copyrighted design without also purchasing a timber frame package.  To the contrary, Davis Frame offered to sell the Reillys the right to use the copyrighted design for $10,000, without any obligation to purchase a timber frame package.  Because Davis Frame did not tell the Reillys they could not purchase one thing without also purchasing another, there was no tying arrangement of the sort contemplated by the Sherman

10

Act.[3]  Accordingly, the Reillys have failed to state a claim under the Sherman Act, and Davis Frame is entitled to dismissal of Count I of the Reillys' counterclaim.

## B. Fraudulent Misrepresentation (Count III)

In Count III of their counterclaim, the Reillys assert that they "were induced to enter into the Agreement [with Davis Frame] by means of the fraudulent representation that [they] could use the Work [i.e., the plans drafted by Davis Frame] in the creation of their home without further obligation to [Davis Frame]." (Countercl. ¶ 26.)  More specifically, the Reillys describe their claim as follows:

> Sometime prior to and/or on or about September, 19, 2003, the Reillys met one Dana Roberts (hereinafter "Roberts"), now a former employee of [Davis Frame]. The Reillys told Roberts that they desired to convert the above described architectural plan into a plan that included timber framing and that James Reilly[] may cut timber himself.  No objection was made by Roberts and it was understood that the Reillys could take the plan to be developed by [Davis Frame] to any company they wanted to cut the timber.
>
> . . .

---

[3] Plainly, Davis Frame did not tell the Reillys they could not purchase preliminary plans and drawings without also purchasing a timber frame package and, in fact, the Reillys were able to do just that.

11

> [Davis Frame] sought to sell the Reillys a timber frame
> package after the Work [i.e., the preliminary plans and
> drawings] was completed.  When the Reillys decided not
> to purchase a timber frame package, [Davis Frame]
> informed the Reillys that [Davis Frame] would pursue
> "all avenues available" unless [] the Reillys purchased
> a timber frame package from [Davis Frame] or, in the
> alternative, paid [Davis Frame] an additional $10,000.
>
> . . .
>
> That [Davis Frame] knew the Reillys were under the
> assumption they could take the plan to be developed by
> [Davis Frame] to any company they wanted to cut the
> timber.
>
> That [Davis Frame] did not disclose that the terms of
> the Agreement require the Reillys to [] purchase a
> timber frame package after the Work was completed upon
> learning of the Reillys' assumption.
>
> That [Davis Frame] failed to correct the Reillys'
> mistake as to the basic assumption on which they
> entered the Agreement.
>
> That [Davis Frame]'s non-disclosure of the terms of the
> Agreement of which the Reillys were mistaken amounts to
> a failure to act in good faith and a failure to act in
> accordance with reasonable standards of fair dealing.

(Countercl. ¶¶ 13, 17, 27–30.)  In their objection to Davis

Frame's motion to dismiss, the Reillys state their

misrepresentation claim somewhat differently: "The

misrepresentation is of a fact, namely, that the Reillys could

use the copyrighted work without purchasing a timber frame

package from [Davis Frame]."  (Pl.'s Obj. at 15.)

12

Davis Frame moves to dismiss Count III on grounds that the
Reillys have failed to: (1) identify a material fact (as opposed
to an opinion or promise) that Davis Frame allegedly
misrepresented; (2) identify any injury they suffered from
relying upon Davis Frame's alleged misrepresentation; and (3)
plead their claim with adequate specificity.

While Count III is captioned as a counterclaim for
fraudulent misrepresentation, it reads like a fraudulent
inducement defense to Davis Frame's breach of contract claim.
However, because the Reillys have framed that argument as a
counterclaim rather than as a contract defense, the court will
analyze it as such.  Under New Hampshire law:

> To establish fraud, a plaintiff must prove that
> the defendant made a representation with knowledge
> of its falsity or with conscious indifference to its truth
> with the intention to cause another to rely upon it.
> Patch v. Arsenault, 139 N.H. 313, 319 (1995).  In
> addition, a plaintiff must demonstrate justifiable
> reliance.  Gray v. First NH Banks, 138 N.H. 279, 283
> (1994).  A plaintiff cannot allege fraud in general
> terms, but must specifically allege the essential
> details of the fraud and the facts of the defendants'
> fraudulent conduct.  Proctor v. Bank of N.H., 123 N.H.
> 395, 399 (1983).

13

<u>Snierson v. Scruton</u>, 145 N.H. 73, 77 (2000) (parallel citations omitted).

On the facts alleged by the Reillys, it is difficult to identify, precisely, the alleged false statement.  The Reillys argue that an agent of Davis Frame told them, falsely, that they "could use the copyrighted work without purchasing a timber frame package," but it is not clear how that statement could be false, given the Reillys' own allegation that they were told that they <u>could</u> use the copyrighted work, without purchasing a timber frame package, <u>if</u> they purchased a license to use the copyrighted work. In other words, based upon the Reillys' own factual allegations, the statement they claim to be false was, in fact, true; Davis Frame did afford the Reillys an opportunity to use the copyrighted work without purchasing a timber frame package.

That leaves the Reillys' apparent contention that Davis Frame's misrepresentation of the terms of the Design Deposit Agreement, i.e., that they were free to use the Davis Frame plans once they were produced, induced them to enter into that

14

agreement.[4]  But if an agent of Davis Frame said something that

was inconsistent, the agreement itself corrected that

inconsistency, and because the agreement explicitly stated that

Davis Frame retained the copyright in the plans it produced, the

Reillys' reliance upon any oral statement to the contrary was

neither reasonable nor justifiable.

The Reillys' allegation that Davis Frame somehow failed to

"disclose" the meaning of the agreement is meritless.  The

agreement said what the agreement said.  The Reillys had an

opportunity to read it before they executed it, and they make no

allegation that they executed the agreement in reliance upon an

inconsistent representation by Davis Frame to the effect that

---

[4] It is not at all clear that one party to an agreement can
fraudulently misrepresent the terms of that agreement to the
other.  Moreover, because the Reillys' ability (i.e., legal
right) to use the plans to build a house was based upon their
agreement with Davis Frame, the case they cite for the
proposition that failure to disclose a buyer's inability to build
a house, Van Der Stok v. Van Voorhees, 151 N.H. 679 (2005), is
inapposite; in that case, a seller's statement that a buyer would
be able to build a house on the land the buyer purchased from the
seller was a misrepresentation because the seller knew that he
had previously been denied a zoning permit to build on that land.
Here, by contrast, the alleged misrepresentation did not concern
knowledge uniquely in the hands of Davis Frame; it concerned the
terms of a written agreement between Davis Frame and the Reillys.

paragraph nine (the copyright ownership provision) did not apply to them.

C. New Hampshire Consumer Protection Act (Count II)

In Count II of their counterclaim, the Reillys assert that Davis Frame's tying arrangement and its fraudulent misrepresentation constitute unfair business practices under the New Hampshire Consumer Protection Act.  However, Davis Frame is not liable for unlawful tying or for fraudulent misrepresentation.  As a result, those two theories cannot serve as the basis for a CPA claim.  On the facts alleged, there is no other basis for a CPA claim.

New Hampshire's Consumer Protection Act makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within the state."  RSA 358-A:2.  The Act prohibits fifteen enumerated business practices, see RSA 358-A:2, I-XIV, as well as any other unfair or deceptive practice that "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Barrows v.

<u>Boles</u>, 141 N.H. 382, 390 (1996) (quoting <u>Levings v. Forbes &</u>
<u>Wallace, Inc.</u>, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979); citing
<u>Tagliente v. Himmer</u>, 949 F.2d 1, 7 (1st Cir. 1991)).

     The Reillys have alleged no conduct on the part of Davis
Frame that rises to the requisite level of rascality.  Based upon
the written agreement, and the factual allegations in the
Reilly's counterclaim, Davis Frame's business practice works in
the following way: (1) a person interested in determining whether
he or she wants to purchase a timber frame package first pays
Davis Frame to execute a set of preliminary plans and drawings,
in which Davis Frame retains the copyright; (2) those who decide
to purchase a timber frame package have part or all of the cost
of drafting their plans credited against the cost of the timber
frame package, and do not pay for a license to use Davis Frame's
copyrighted plans; (3) those who decline to purchase a timber
frame package from Davis Frame, and who do not wish to use the
copyrighted plans, pay full price for those plans; and (4) those
who decline to purchase a timber frame package from Davis Frame,
but who do wish to use the copyrighted plans, pay full price for
the plans, and must also buy a license to use them.  In other

words, Davis Frame provides an incentive to encourage potential customers to purchase its timber frame packages by reducing the design fee and waiving a licensing fee for those who purchase Davis Frame packages.

Davis Frame's policy does not amount to an unfair or deceptive business practice under the New Hampshire CPA. There is nothing unfair in requiring customers pay the costs of drafting preliminary plans and drawings, and there is nothing unfair in Davis Frame's retaining the copyright in plans it drafts, or in requiring customers to purchase a license to use those copyrighted plans. Similarly, there is nothing at all deceptive in Davis Frame's business practice.

The possibility that customers might pay full price (at least $1,750) for a plan that is never used to build a house is disclosed in the first paragraph of the Design Deposit Agreement, which recites that the purpose of producing preliminary plans and drawings is to allow a purchaser of plans and drawings "to determine whether Purchaser wishes to purchase said [timber frame] package." In other words, people in the Reillys' position

18

agree to purchase plans and drawings and assume the risk that, for whatever reason, they may later decide not to purchase a timber frame package, thus forfeiting the opportunity to have some or all of the price of the plans credited against the cost of a package.  In like manner, Davis Frame's explicit retention of a copyright in its plans and drawings, as explained in paragraph nine of the agreement, lets purchasers know at the outset that they have a limited right – or no right at all – to use the plans to do anything other than decide whether to purchase a Davis Frame package.  Again, customers agree to purchase plans knowing, at the outset, that they are not also purchasing a license to use the plans.  Davis Frame's business practice is not deceptive because all the information consumers need to protect themselves is spelled out in the agreement they sign before Davis Frame does any work.

Because the business practice described in the counterclaims is not expressly prohibited by the CPA, and does not rise to the level of rascality necessary for an unenumerated business practice to violate the CPA, Davis Frame is entitled to dismissal of Count II of the Reillys' counterclaim.

**Conclusion**

For the reasons given, Davis Frame's motion to dismiss the Reillys' counterclaims (document no. 12) is granted.  The case shall continue on track for trial on Davis Frame's claims against the Reillys.


**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 22, 2006

cc:  W. E. Whittington, IV, Esq.
     Michael J. Bujold, Esq.
     Neal E. Friedman, Esq.